**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

VILLAGE OF SUGAR GROVE,           )
                                  )
          Plaintiff,              )
                                  )
          v.                      )     No. 10 C 3562
                                  )
FEDERAL DEPOSIT INS. CORP., as    )
Receiver for Benchmark Bank, and  )
MB FINANCIAL BANK,                )
                                  )
          Defendants.             )


### MEMORANDUM OPINION

Before the court are: (1) the defendants' joint motion to dismiss plaintiff's second amended complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6); and (2) the plaintiff's motion to remand this case to state court. For the reasons explained below, we grant the defendants' motion in part and deny it in part, and deny the plaintiff's motion.

### BACKGROUND

In 2004 the Village of Sugar Grove (the "Village") annexed previously unincorporated property owned by Hannaford Farm, L.L.C. ("Hannaford"). (Second Am. Compl. ¶ 8.) In exchange for the benefits of incorporation — public utilities, police protection, etc. — Hannaford agreed to build certain public improvements, such as roads, sewers, and water mains. (Id. at ¶¶ 9-10.) Hannaford had purchased the property, and acquired the means to develop it,

using a loan (the "Development Loan") from Benchmark Bank, N.A. ("Benchmark"). (Id. at ¶ 27; see also Real Estate Mortgage, part of Group Ex. C to the Second Am. Compl., at 1 (indicating that the mortgage secured a promissory note in the amount of $10.1 million).) Hannaford began developing the property, and agreed to build other improvements as the project proceeded (e.g., finishing roadways with a "top coat" of asphalt after the heavy construction traffic abated). (Id. at ¶¶ 12-13.) The Village estimated that the cost of performing these future obligations would exceed $2,077,675.13, and required Hannaford to post security in that amount. (Id. at ¶¶ 13-14.) To that end, Hannaford obtained letters of credit from Benchmark. (Id. at ¶ 16; see also Letters of Credit Nos. 13292 and 14186, attached as Group Ex. B to Second Amend. Compl.) The letters of credit entitled the Village to demand payment in the event Hannaford defaulted in a manner spelled out in the agreement.[1] In connection with the letters of credit, Hannaford executed promissory notes in Benchmark's favor in amounts equal to the face amounts of the letters of credit. (Loan Nos. 14186 and 13292, part of Group Ex. C attached to Second Am. Compl.)

On October 7, 2009 the Village notified Benchmark that Hannaford had defaulted and presented "sight drafts" to the bank

---

[1] (See, e.g., Letter of Credit No. 13292 at 3 ("It is agreed that the following shall be considered a default by our customer and shall entitle the Village to make demand on this Letter of Credit: . . . (4) that the Village of Sugar Grove has determined that the owner and/or subdivider has demonstrated that they will be unable to complete the improvements.").)

demanding payment pursuant to the letters of credit.[2] (Second Am. Compl. ¶¶ 20-22; see also Village Resolutions, Notices, and Sight Drafts, attached as Group Ex. D to Second Am. Compl.) Shortly thereafter, the FDIC and the Illinois Department of Financial and Professional Regulation ("IDFPR") issued a cease and desist letter to Benchmark, citing "unsafe or unsound banking practices." (See Cease and Desist Letter, part of Group Ex. D to FDIC's Notice of Removal; see also Second Am. Compl. ¶ 28.) The Village alleges on information and belief that the FDIC "influenced or required" Benchmark to dishonor the Village's sight drafts. (Second Am. Compl. ¶ 108.) Benchmark's failure to respond to the sight drafts prompted the Village to file this lawsuit in the Circuit Court of Kane County asserting claims against Benchmark for breach of contract and wrongful dishonor under the Illinois Commercial Code. (Id. at ¶¶ 23-24; see also Original Compl., part of Group Ex. D to FDIC's Notice of Removal.) Benchmark appeared and defended itself before the IDFPR closed the bank on December 4, 2009. (Second Am. Compl. at ¶ 25; see also IDFPR Notice, attached as Ex. A to FDIC's Notice of Removal (stating that the IDFPR's Director closed Benchmark because it was "operating with impaired capital and is conducting its business in an unsafe and unsound manner").) The FDIC was then appointed Benchmark's receiver, and promptly entered

---

[2] A "sight draft" is a "draft that is payable on the bearer's demand or upon proper presentment to the drawer." Black's Law Dictionary 566 (9th Ed. 2009).

into a Purchase and Assumption Agreement with defendant MB Financial, pursuant to which MB Financial acquired certain assets and liabilities of Benchmark (including the Development Loan). (Second Am. Compl. ¶¶ 29-32; _see also_ Purchase and Assumption Agreement, dated Dec. 4, 2009, attached as Ex. E to Second Am. Compl.) The parties dispute whether MB Financial assumed Benchmark's liability to the Village.

As we will discuss in more detail later in this opinion, a failed bank's creditors must comply with the administrative claims process established by the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA"). _See generally_ 12 U.S.C. § 1821(d); _see also_ _Maher v. FDIC_, 441 F.3d 522, 525 (7th Cir. 2006). On December 11, 2009, the Village filed a proof of claim with the FDIC claiming $2,077,675.12 — the combined face amounts of the letters of credit — and attached their complaint in this case. (Second Am. Compl. ¶ 40; _see also_ Proof of Claim, attached as Ex. F. to Second Am. Compl.) While that process was underway, the Village continued to pursue its claims in state court, amending its complaint in January 2010 to add MB Financial as a defendant on a successor-liability theory. (_See_ Order, dated Jan. 7, 2010, and Am. Compl., part of Group Ex. D to FDIC's Notice of Removal.) In May 2010, the FDIC was formally substituted for Benchmark as a defendant in this case and shortly thereafter it removed the case to this court. _See_ 12 U.S.C. § 1819(b)(2)(B)(authorizing removal within 90 days after

the FDIC is substituted as a party). The FDIC "allowed" the Village's administrative claim on September 10, 2010, and issued a "Receiver's Certificate" for the full amount claimed ($2,077,675.13). (Second Am. Compl. ¶ 42.) According to the Village, the Receiver's Certificate is worthless because the FDIC has classified the Village as a general unsecured creditor and there are no funds available to pay this tier of creditors. (Id. at ¶¶ 43-44.)

Dissatisfied with the outcome of the administrative claims process, the Village sought and obtained our leave to file a Second Amended Complaint. In addition to the four claims previously asserted against the FDIC and MB Financial (Counts I-IV), the Second Amended Complaint added claims for: breach of the Purchase and Assumption Agreement against MB Financial on a third-party beneficiary theory (Count V); declaratory judgment (Count VI); administrative review under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq. (Count VII); and de novo review pursuant to FIRREA § 1821(d)(6)(A) (Count VIII). The defendants have now moved to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim for relief.

## DISCUSSION

### A. Legal Standard

When considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, we accept as true all well-pled

factual allegations and draws reasonable inferences from the allegations in favor of the plaintiff. <u>Capitol Leasing Co. v. FDIC</u>, 999 F.2d 188, 191 (7th Cir. 1993). We may also look beyond the allegations of the complaint and consider affidavits and other documentary evidence to determine whether subject matter jurisdiction exists. <u>Id.</u>

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1356, at 354 (3d ed. 2004). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 556 (2007)).

**B.    Subject Matter Jurisdiction**

The FDIC bases its jurisdictional challenge on 12 U.S.C. § 1821(d)(13)(D) ("Limitation on judicial review"), which provides as follows:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over —
>
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the

Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D). In light of other FIRREA provisions permitting judicial review, courts have interpreted § 1821(d)(13)(D) to require claimants to exhaust their administrative remedies. See Village of Oakwood v. State Bank and Trust Co., 539 F.3d 373, 385-86 (6th Cir. 2008) (collecting cases). Practically speaking, that means submitting a proof of claim to the FDIC for determination and seeking judicial or administrative review within the time limits imposed by the statute:

Upon its appointment as receiver, FDIC is required to publish notice that the failed institution's creditors must file claims with FDIC by a specified date not less than ninety days after the date of publication. 12 U.S.C. § 1821(d)(3)(B). FDIC is also required to mail notice to all known creditors of the failed institution. Id. § 1821(d)(3)(C). It has 180 days from the date of filing to allow or disallow claims. Id. § 1821(d)(5)(A)(i). Claimants have sixty days from the date of disallowance, or from the expiration of the 180-day administrative decision deadline, within which to seek judicial review in an appropriate United States district court. Id. § 1821(d)(6)(A).

Simon v. FDIC, 48 F.3d 53, 56 (1st Cir. 1995). The Village filed its proof of claim in December 2009, within the period prescribed by the statute, and the FDIC allowed the claim nine months later. (The Village and the FDIC evidently agreed to extend the 180-day review period. (See Pl.'s Resp. at 10); see also 12 U.S.C. § 1821(d)(5)(A)(ii) (authorizing extensions by written agreement

between the FDIC and the claimant).)  Within two weeks after the
FDIC ruled on the Village's claim the parties appeared at a status
hearing before this court and the Village requested leave to amend
its complaint, signaling its intent to "continue" this action.  See
12 U.S.C. § 1821(d)(6)(A)(ii) (within sixty days after  "the date
of any notice of disallowance . . . the claimant may . . . continue
an action commenced before appointment of the receiver").

The parties dispute the significance of the fact that the FDIC
"allowed" the Village's claim.   The 60-day period to obtain
judicial or administrative review is triggered by (1) the end of
the 180-day period in which the FDIC must rule on the claim, or (2)
"any notice of disallowance of such claim."   12 U.S.C. §
1821(d)(6)(A)(i) & (ii); see also Capital Leasing, 999 F.2d at 192-
93.   The defendants argue that FIRREA's failure to mention
"allowed" claims means that they are unreviewable.  (Defs.' Mem. at
6.)[3]  They cite language from several cases reflecting the
statute's use of the phrase "disallowance," but these cases do not
involve "allowed" claims and there is no indication that the courts
even considered the issue.  See, e.g., Capital Leasing, 999 F.2d at
191-92.  FIRREA authorizes the FDIC to "disallow any portion of any
claim by a creditor or claim of security, preference, or priority

---

[3] For its part, the Village argues that § 1821(d)(6)'s failure to mention
allowed claims means that claimants are free to seek judicial review outside the
limits that provision imposes.  (Pl.'s Resp. at 10.)  This interpretation, which
the Village does not support with any relevant authorities, is inconsistent with
§ 1821(d)'s evident purpose to quickly and finally determine a failed bank's
liabilities.  Accordingly, we reject it.

which is not proved to the satisfaction of the receiver." 12 U.S.C. § 1821(D)(i). The thrust of the Village's argument is that the FDIC "disallowed" its claim of priority by miscategorizing Benchmark's liability to the Village, treating the Village as a general unsecured creditor when it should be treated as a secured creditor and/or depositor. (Second Am. Compl. ¶¶ 43, 46-61.) As a general unsecured creditor, the Village has not and will not receive any money for its claim. (Id. at ¶ 44.) The court in McCallister v. FDIC, 87 F.3d 762, 767 (5th Cir. 1996), while acknowledging that § 1821(d)(6) does not mention allowed claims, indicated that an allowance that implicitly disallows a claim of priority may be reviewable under § 1821(d)(6). This approach makes sense, otherwise decisions affecting a claimant's actual recovery would be insulated from review. We conclude that we have subject matter jurisdiction over Counts I through IV of the Second Amended Complaint.

The defendants separately argue that we should dismiss Counts V through VIII because they were filed more than 60 days after the notice of allowance. (Defs.' Mem. at 6-7.) The Village initially requested leave to file its Second Amended Complaint on September 22, 2010, well within the 60-day period prescribed by § 1821(d)(6). We entered and continued its motion to October 13, 2010 — still within the 60-day review period — because we believed, based upon the parties' representations at the hearing, that settlement was possible and advisable. We later granted the parties' joint motion

to reset the hearing for November 10, 2011 so that they could continue settlement negotiations.  The defendants now take the position that November 9, 2010 was the final day to add new claims, despite jointly requesting to move the hearing on the Village's motion to November 10.  The case that they rely on, <u>Brown Leasing Company v. FDIC</u>, 833 F.Supp. 672 (N.D. Ill. 1993), is distinguishable.  In <u>Brown Leasing</u>, the plaintiff amended its complaint to add claims for breach of contract and conversion after the time for submitting claims to the receiver had expired.  <u>Id.</u> at 674.  The court concluded that these claims, which requested an additional $800,000 over and above the amounts requested in the plaintiff's original complaint, were not part of the proof of claim that the plaintiff had filed with the FDIC:

> The facts spelled out in the [original] complaint do not attribute any wrongdoing to Cosmopolitan's maintenance of plaintiff's deposit checking account, as alleged in Count IV (conversion claim) and Count V (breach of contract claim) of the amended complaint.  In fact, Brown Leasing never mentions any misappropriation, much less the sum of $800,000 in the entire original complaint.

<u>Id.</u> at 675.  Consequently, the court dismissed the plaintiff's breach-of-contract and conversion claims because it had not exhausted its administrative remedies as to those claims.  <u>Id.</u> at 675-76.  In contrast, Counts V through VIII are based on essentially the same facts and legal theories underpinning the Village's original complaint.  In Counts V, VII, and VIII the Village seeks, as it has all along, $2,077,675.13 based upon

Benchmark's failure to honor the sight drafts. (<u>See</u> Second Am. Compl. at 16, 20-21.) Count VI seeks a declaratory judgment that the defendants themselves maintain "is duplicative of [the Village's] breach of contract action." (Defs.' Mem. at 19.) We conclude that the FDIC received "fair notice of the facts and legal theories" underpinning the Village's claim. <u>Brown Leasing</u>, 833 F.Supp. at 675. In sum, we conclude that we have subject matter jurisdiction over the Second Amended Complaint in its entirety.[4]

**D. Failure to State a Claim Upon Which Relief Can Be Granted**

Although the defendants ostensibly move to dismiss for failure to state a claim, their arguments actually address the merits of the Village's claims. As we explain below, we conclude that further factual development and argument is necessary.

**1. Whether the Receiver's Certificate Mooted the Village's Claims**

The defendants contend that the Receiver's Certificate constitutes full payment for the claims asserted in Counts I through V. Under FIRREA, a general unsecured creditor is only entitled to "a pro rata share of the proceeds from the liquidation of the financial institution's assets." <u>Battista v. FDIC</u>, 195 F.3d 1113, 1117 (9th Cir. 1999); <u>see also</u> 12 U.S.C. § 1821(i)(2) (limiting the FDIC's liability to the amount a claimant would have

---

[4] Because we conclude that we have subject matter jurisdiction, the Village's motion to remand the case pursuant to 28 U.S.C. § 1447 is denied. <u>See</u> 28 U.S.C. § 1447 ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

received if the failed bank had been liquidated). The Ninth Circuit has held that the FDIC "may pay creditors with receiver's certificates instead of cash," reasoning that "[t]o require the FDIC to pay certain creditors in cash would allow those creditors to 'jump the line,' recovering more than their pro rata share of the liquidated assets, if the financial institution's debts exceed its assets." Battista v. FDIC, 195 F.3d 1113, 1116-17 (9th Cir. 1999); see also RTC v. Titan Fin. Corp., 36 F.3d 891, 892 (9th Cir. 1994). According to the FDIC, the Village is a general unsecured creditor and therefore the receiver's certificate fully satisfies its claim. The fact that there are no remaining funds to pay unsecured creditors is just an unfortunate consequence of Benchmark's failure. The Village responds that the sight drafts are "deposits," as the Federal Deposit Insurance Act defines that term, and cannot be satisfied with a receiver's certificate. (Pl.'s Resp. at 14.)

The defendants maintain that the Village's argument is foreclosed by FDIC v. Philadelphia Gear Corporation, 476 U.S. 426, 440 (1986), which held that a standby letter of credit backed by a contingent promissory note is not a "deposit." Philadelphia Gear Corporation was the beneficiary of a standby letter of credit issued by Penn Square Bank, N.A. on the application of Orion Manufacturing Corporation, Philadelphia Gear's customer. Id. at 427-28. A "standby" letter of credit is "intended to provide

payment to the seller only if the buyer of the invoiced goods fail[s] to make payment." Id. at 428.[5] On the same day that Penn Square issued the letter of credit, Orion executed an unsecured promissory note in favor of Penn Square in the face amount of the letter of credit. Id. The promissory note was not contingent on its face, but the parties (Penn Square and Orion) "understood that nothing would be considered due on the note, and no interest charged by Penn Square, unless Philadelphia Gear presented drafts on the standby letter of credit after nonpayment by Orion." Id. Philadelphia Gear presented drafts on the letter of credit to Penn Square shortly after the FDIC took over the bank. Id. at 428-29. When the FDIC returned the drafts unpaid, Philadelphia Gear sued the FDIC for deposit insurance and the uninsured balance of the letter of credit. Id. at 429. Under the Federal Deposit Insurance Act, the term "deposit" includes:

> the unpaid balance of money or its equivalent received or held by a bank or savings association in the usual course of business and . . . which is evidenced by . . . a letter of credit . . . on which the bank or savings association is primarily liable: *Provided*, That, without limiting the generality of the term "money or its equivalent", any such account or instrument must be regarded as evidencing the receipt of the equivalent of money when credited or issued in exchange for . . . a promissory note upon which the person obtaining any such credit or instrument is primarily or secondarily liable . . . .

---

[5]/ "A conventional 'commercial' letter of credit, in contrast, is one in which the seller obtains payment from the issuing bank without looking to the buyer for payment even in the first instance." Philadelphia Gear, 476 U.S. at 428.

12 U.S.C. § 1813(l)(1).[6]  Philadelphia Gear successfully argued in the lower courts that the standby letter of credit was a deposit: Penn Square was "primarily liable" on a "letter of credit" evidencing the receipt of "money or its equivalent" (i.e., a "promissory note" upon which Orion was "primarily" liable).  <u>See Philadelphia Gear Corp. v. FDIC</u>, 751 F.2d 1131, 1134-35 (10th Cir. 1984) (<u>rev'd</u> 476 U.S. 426 (1986)).  The Supreme Court rejected this interpretation, relying instead on the FDIC's "longstanding" position that a standby letter of credit backed by a contingent promissory note is not a deposit.  <u>Philadelphia Gear</u>, 476 U.S. at 438-39.  This interpretation, the Court concluded, was consistent with the purpose behind Congress's decision to create the FDIC: to ensure "that a deposit of 'hard earnings' entrusted by individuals to a bank would not lead to a tangible loss in the event of a bank failure."  <u>Id.</u> at 433.  Orion did not "surrender any assets unconditionally to the bank" and the "bank did not credit any account of Orion's in exchange for the promissory note, and did not treat its own assets as increased by its acceptance of the note."  <u>Id.</u> at 435.  The Court contrasted this arrangement with a letter of credit backed by an "uncontingent" promissory note, which the FDIC conceded was an insured deposit.  <u>Id.</u> at 440.

---

    [6]/  The definition of "deposit" in the current statute is substantially similar to the definition in effect when the Supreme Court decided <u>Philadelphia Gear</u>.

The Village alleges that the promissory notes that Hannaford executed were "uncontingent." (Second Am. Compl. ¶ 19.)  The defendants insist otherwise, but they do not support their assertion with any analysis. (See Defs.' Reply at 11.)  The notes do not clearly indicate on their face that they are contingent, and at this stage of the case the defendants are not entitled to the inference that the documents (viewed as a whole) show that they are contingent.  See, e.g., Adkins v. VIM Recycling, Inc., 644 F.3d 483, 492-93 (7th Cir. 2011) (on a motion to dismiss the court construes the complaint in the light most favorable to the plaintiff).  Indeed, as far as we can tell, the promissory notes matured before the Village presented the drafts to Benchmark. (See, e.g., Loan No. 14186, part of Group Ex. C attached to Second Am. Compl ("Principal: I agree to pay the principal At Maturity - June 01, 2009"); Second Am. Compl. ¶ (alleging that the Village presented the letters of credit to Benchmark for payment on October 7, 2009).)  If in fact the principal was not due because Hannaford had not yet defaulted, then the defendants must establish that fact with some other evidence.  Even if the notes were contingent before Hannaford defaulted, they were arguably "uncontingent" when the Village presented the drafts to Benchmark for payment, months before the FDIC was appointed receiver.  The defendants argue that presentment is irrelevant, citing Murphy v. FDIC, 38 F.3d 1490, 1503-04 (9th Cir. 1994).  Murphy, which is not binding on this

court, is distinguishable in at least two respects: (1) the issuing bank in that case did not receive a note (contingent or otherwise) in exchange for the letters of credit (see id. at 1504);[7] and (2) the court had the benefit of an evidentiary record.  We are not in a position, at this stage of the case, to rule as a matter of law that the Village's sight drafts are not "deposits" under the Federal Deposit Insurance Act.  In sum, we deny the defendants' motion to dismiss Counts I through V on the ground that the Village has received all the payment to which it is entitled.

## 2.   Dismissal on the Ground that MB Financial Has Not Assumed Liability for "Standby Letters of Credit"

As the defendants point out, the Purchase and Assumption Agreement expressly excludes "standby letters of credit" from the liabilities that MB Financial agreed to assume.  (Purchase and Assumption Agmt. § 2.1(g).)  But the agreement also states that MB Financial "agrees to pay, perform, and discharge . . . Assumed Deposits."  (Id. at § 2.1(a).)  Under the agreement, the phrase "Assumed Deposits" means "Deposits," which is in turn defined as "a deposit as defined in 12 U.S.C. Section 1813(l)," with certain exceptions that do not appear to be relevant.  (Id. at Art. I.)  If we ultimately conclude that the Village's drafts are deposits as

---

[2/]  In Murphy, the failed bank's holding company used the bank to backstop the holding company's debts without giving the bank any collateral.  Murphy, 38 F.3d at 1496.  The fact that the beneficiary had presented drafts to the bank before the FDIC was appointed did not change the fact that the bank never received "money or its equivalent" in exchange for the letters.  Id. at 1504. Murphy does not shed any light on whether a note that is arguably uncontingent when the FDIC is appointed is "money or its equivalent."

defined in 12 U.S.C. § 1813(l), then we will have to resolve the apparent conflict between § 2.1(a) and (g).  That question is beyond the scope of defendants' Rule 12(b)(6) motion for the reasons we have already discussed.

**3.  The Village's Wrongful Dishonor Claim Against MB Financial (Count IV)**

MB Financial argues that we should dismiss Count IV because the complaint does not allege that the Village presented the letters to MB Financial for payment.  (Defs.' Mem. at 13-14); see Mount Prospect State Bank v. Marine Midland Bank, 459 N.E.2d 979, 983-84 (Ill. App. 1983) (The beneficiary of a letter of credit must strictly comply with its terms.).  The thrust of Count IV, which is alleged in the alternative to the Village's wrongful-dishonor claim against the FDIC as Benchmark's receiver, is that MB Financial has stepped into Benchmark's shoes with respect to the drafts.  (Second Am. Compl. ¶ 82.)  The Village alleges that it strictly complied with the requirements of the letters of credit when it submitted the drafts to Benchmark for payment.  Benchmark could not insist that the Village resubmit the drafts, therefore neither can MB Financial. None of the authorities that MB Financial cites support its contention that the beneficiary of a letter of credit must resubmit a dishonored draft to a failed bank's successor in order to pursue a claim for wrongful dishonor.  The defendants' motion to dismiss Count IV is denied.

**4.    The Village's Claim for Breach of the Purchase and Assumption Agreement (Count V)**

The Village alleges that it is a third party beneficiary of the Purchase and Assumption Agreement between the FDIC and MB Financial. (Second Am. Compl. ¶ 94.) "Under Illinois law, a person is considered a third party beneficiary only when the benefit to him is intended and he may therefore sue for breach of the contract. If the benefit is merely incidental, the third person has no right of recovery arising from the contract.  This test is determined by the manifestation of the parties' intent expressed through the language of the contract."  <u>Golden v. Barenborg</u>, 53 F.3d 866, 870 (7th Cir. 1995) (citations omitted).   The Purchase and Assumption Agreement provides that,

> [e]xcept as otherwise specifically provided in this Agreement, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the Receiver, the Corporation and the Assuming Bank any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein, it being the intention of the parties hereto that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver, the Corporation and the Assuming Bank and for the benefit of no other Person.

(Purchase and Assumption Agreement § 13.5.)  The parties evidently contemplated that some third parties would have rights to enforce the agreement, otherwise the "except as otherwise specifically provided" language would be meaningless.  And defendants seem to concede that Benchmark's former depositors could sue MB Financial

for breach of the agreement if, for example, the bank dishonored a draft drawn on Benchmark and presented to MB Financial for payment. (Defs.' Reply at 16.)  As we have already discussed, the Village alleges that the letters of credit are deposits as that term is defined in the Federal Deposit Insurance Act.  MB Financial agreed to assume such deposits, (Purchase and Assumption Agreement Art. I; § 2.1(a)), but refuses to pay the Village.  This is sufficient to state a claim for breach of contract on a third party beneficiary theory.

**5.    The Village's Claim for Declaratory Judgment (Count VI)**

The defendants argue that the Village's claim for declaratory relief is barred by FIRREA.  Section 1821(j) of FIRREA states that

> Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver.

12 U.S.C. § 1821(j).  This provision broadly "prohibits a court from taking any action either to restrain or affect the FDIC's exercise of its powers as a receiver, unless authorization can be found elsewhere in the section." Courtney v. Halleran, 485 F.3d 942, 948 (7th Cir. 2007).  Insofar as a party seeks a declaratory judgment that "restrains or affects" the FDIC's powers as receiver, it is barred.  See id.; Freeman v. FDIC, 56 F.3d 1394, 1399 (D.C. Cir. 1995) ("Not only does it bar injunctive relief, but in the circumstances of the present case where appellants seek a

declaratory judgment that would effectively 'restrain' the FDIC from foreclosing on their property, § 1821(j) deprives the court of power to grant that remedy as well."). We do not believe that the requested declaration — asking us to declare the parties' rights with respect to the sight drafts — restrains or affects the FDIC in the relevant sense. Cf. Carney v. Resolution Trust Corp., 19 F.3d 950, 958 n.3 (5th Cir. 1994) ("Naturally, we do not hold that § 1821(j) would bar all actions for declaratory relief against the receiver of a failed financial institution."). The Village does not contend that the FDIC was required to transfer Benchmark's liability under the letters of credit to MB Financial or another entity. Rather, the Village contends that the FDIC in fact transferred that liability under a fair reading of the Purchase and Assumption Agreement. We do not read § 1821(j) to prohibit us from declaring the parties' rights under that agreement, or to require us to accept the FDIC's interpretation of it. And insofar as Count IV relates to the FDIC's treatment of the Village's administrative claim, that matter is properly before us under 12 U.S.C. § 1821(d)(6). See supra. Courtney is distinguishable. In that case the FDIC executed a settlement agreement with certain principals of a failed bank. Id. at 945-46. The plaintiffs — depositors who objected to the settlement — sought declaratory and injunctive relief that would have prevented the FDIC from carrying out the settlement's terms. Id. Our Court of Appeals held that the relief the plaintiffs sought

would interfere with the FDIC's broad authority to settle claims and transfer assets. <u>Id.</u> at 948; <u>see also</u> 12 U.S.C. § 1821(d)(2)(G)(i)(II) (authorizing the FDIC to "transfer any asset or liability of the institution in default (including assets and liabilities associated with any trust business) without any approval, assignment, or consent with respect to such transfer"); <u>id.</u> at § 1821(p)(3) (authorizing the FDIC to sell the assets of the failed bank to settle claims against third-parties). Here, the Village asks us to declare the legal effect of actions the FDIC has already taken.

The defendants separately argue that we should dismiss Count VI because it is duplicative of the Village's other claims. We have discretion to decline to hear a declaratory judgment action, <u>see Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.</u>, 819 F.2d 746, 747 (7th Cir. 1987), and courts have exercised that discretion where a plaintiff seeks a declaratory judgment that substantially overlaps its substantive claims. <u>See, e.g.</u>, <u>Dixie Gas & Food, Inc. v. Shell Oil Co.</u>, No. 03 C 8210, 2005 WL 1273273, *5 (N.D. Ill. May 25, 2005) ("[T]he process for determination on the merits is underway in this suit, and the additional declaratory judgment action requested by plaintiffs is redundant."). Here, the Village asks us to declare the parties' rights and obligations with respect to the drafts that the Village presented to Benchmark. As our foregoing discussion indicates, we will necessarily address those issues in adjudicating

the Village's substantive claims. See <u>Amari v. Radio Spirits, Inc.</u>, 219 F.Supp.2d 942, 944 (N.D. Ill. 2002) ("All of the issues in the declaratory judgment claim will be resolved by the substantive action, so the declaratory judgment serves no useful purpose."); <u>see also</u> <u>Classic Business Corp. v. Equilon Enterprises, LLC</u>, No. 09 C 7735, 2011 WL 290431, *5 (N.D. Ill. Jan. 27, 2011). The Village argues that it is entitled to maintain its declaratory judgment action because damages may not adequately compensate it, "whether because of the powers of the FDIC or the limits of its insurance." (Pl.'s Resp. at 23-24.) A declaratory judgment will not increase the Village's recovery if it is otherwise limited by rule or statute. Count VI serves "no useful purpose" in this litigation, and the case would be "streamlined" if we dismissed it. <u>Amari</u>, 219 F.Supp.2d at 945; <u>see also</u> <u>Dixie Gas & Food</u>, 2005 WL 1273273, *7.

## **CONCLUSION**

The defendants' joint motion to dismiss (24) is denied in part and granted in part. The motion is granted with respect to Count VI, which is dismissed with prejudice. The motion is denied with respect to the remaining counts of the complaint. The Village's motion to remand the case to state court (31) is denied. A status hearing is set for September 28, 2011 at 10:30 a.m.

DATE:       September 1, 2011

ENTER:      _____

            John F. Grady, United States District Judge