**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VILLAGE OF SUGAR GROVE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 10 C 3562 |
| ) | |
| FEDERAL DEPOSIT INS. CORP., ) | |
| FEDERAL DEPOSIT INS. CORP., as ) | |
| Receiver for Benchmark Bank, and ) | |
| MB FINANCIAL BANK, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

Before the court is the Village of Sugar Grove's (the "Village") challenge to the Federal Deposit Insurance Corporation's ("FDIC") ruling denying the Village's claim for deposit insurance. For the reasons explained below, we uphold the FDIC's ruling.

**BACKGROUND**

In September 2004, Benchmark Bank issued a Letter of Credit ("LOC") in favor of the Village in the amount of $2,454,807.00. (See LOC No. 13292, dated Sept. 1, 2004, at AR 8-18.)[1] In June 2006, Benchmark issued a second LOC in favor of the Village in the amount of $4,538,634.00. (See LOC No. 14186, dated June 1, 2006, at AR 22-30.) The two LOC's secured the obligation of Hannaford

---

[1] "AR" citations refer to the administrative record in this case. (See Certified Copy of Admin. Record, Dkt. 74.)

Farm, LLC ("Hannaford"), the bank's "customer," to construct certain property improvements. (See, e.g., LOC 13292 at AR 2-3.) The LOC's obligated Benchmark to pay the Village upon demand certifying that Hannaford had defaulted in the manner described in the LOC's. (See, e.g., id. at AR 10-11.) The LOC's were each for a one-year term, although they contained a provision renewing the agreements indefinitely until Benchmark provided 90-days written notice of expiration. (See, e.g., id. at AR 9.) Notwithstanding this "evergreen" provision, Benchmark periodically "amended" the LOC's to extend them for additional one-year terms through 2010. (See, e.g., id. at AR 13-18.)

In connection with each LOC, Hannaford executed notes in Benchmark's favor in the face amounts of the LOC's. (See Note No. 13292, dated Sept. 1, 2004, at AR 288-290; Note No. 14186, dated June 1, 2006, at AR 268-270.)[2] The notes contained a "maturity date" corresponding to the "expiration date[s]" of the LOC's. (See, e.g., Note No. 13292, dated Sept. 1, 2004, at AR 288.) The parties executed new notes as the LOC's were amended to extend the expiration date. The last such notes were executed on September 1, 2008 (maturity date: September 1, 2009) and June 1, 2008 (maturity date June 1, 2009), respectively. (See Note No. 13292, dated

---

[2]/ The notes were also executed by other individuals and entities, but the record does not disclose what role these parties played in the relevant transactions. Consistent with the parties' practice, and for the sake of simplicity, we will refer to the notes as if they were executed by Hannaford, only.

September 1, 2008, at AR 19-21; Note No. 14186, dated June 1, 2008, at AR 31-33.) The notes state that, "[f]or value received, I promise to pay you, or your order, at your address listed above the PRINCIPAL sum of [amount]." (See, e.g., Note No. 13292, dated September 1, 2008, at AR 19; see also id. ("I agree to pay the principal [a]t [m]aturity — SEPTEMBER 01, 2009.").) Beneath this language, the parties checked a box indicating that Hannaford would receive "Multiple Advance[s]" — as opposed to a single, lump-sum payment — not exceeding the principal amount. (See, e.g., id.) The note form includes spaces to fill in the amount and date of the initial advance, which are left blank in the executed notes. (See, e.g., id.) In the space for indicating the "conditions of future advances," the notes state: "PER LETTER OF CREDIT." (See, e.g., id.) The notes also provide a method for calculating the applicable interest rates before and after the maturity date. (See, e.g., id.) The first note identifies the purpose of the "loan" as "LETTER OF CREDIT — VILLAGE OF SUGAR GROVE." (Note No. 13292, dated Sept. 1, 2004, at AR 288.) Subsequent notes state, "RENEWAL/LETTER OF CREDIT — VILLAGE OF SUGAR GROVE." (See, e.g., Note No. 13292, dated Sept. 1, 2005, at AR 286.)

In October 2009, the Village, citing defaults by Hannaford, presented sight drafts to Benchmark demanding payment pursuant to

the LOC's in the amount of $2,077,675.13.[3] (See Sight Drafts at AR 38-43.) Benchmark did not honor the Village's drafts, prompting the Village to file this lawsuit for wrongful dishonor in state court. On December 4, 2009, the Illinois Department of Financial and Professional Regulation closed Benchmark and the FDIC was appointed as its receiver. The FDIC, as receiver for Benchmark ("FDIC-R"), removed this case to this court after it was substituted for Benchmark as the defendant. Meanwhile, the Village submitted a proof of claim to the FDIC-R predicated on Benchmark's failure to honor the Village's drafts. (See Proof of Claim at AR 434.) The FDIC-R allowed the Village's claim in the full face amount of the LOC's as a "Tier 3" general creditor claim. (See Letter Enclosing Receiver Certificate, dated Sept. 10, 2010, at AR 435-36; see also Letter from A. Rouse to S. Andersson (hereinafter, "FDIC Ruling"), dated June 4, 2012, at 3.) The Village disputes that categorization, arguing that it should instead be treated as a depositor. See Village of Sugar Grove v. F.D.I.C., No. 10 C 3562, 2011 WL 3876935, *2 (N.D. Ill. Sept. 1, 2011). In February 2012, the Village amended its complaint to assert a claim against the FDIC in its corporate capacity. (See Third Am. Compl., Dkt. 50, ¶¶ 113-121.) We subsequently granted the parties' joint motion to stay that claim pending the FDIC's decision on the Village's

---

[3] The original LOC's were amended to reduce the amount of Benchmark's commitment. (See, e.g., LOC No. 13292 at AR 13.) The Village's $2,077,675.13 demand constituted the full amount of the two LOC's at that time.

claim for deposit insurance.  (See Joint Stay Mot., Dkt. 61, ¶¶ 4-6.)  The FDIC denied the Village's deposit-insurance claim on June 4, 2012, reasoning that the LOC's were not "deposits" as that term is defined by 12 U.S.C. § 1813.  The Village now asks us to overturn that decision.

## DISCUSSION

**A.  Legal Standard**

The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, governs our review of the FDIC's ruling.  See 12 U.S.C. § 1821(f)(4).  We will uphold the FDIC's factual findings if they are supported by "substantial evidence on the record as a whole." Michael v. F.D.I.C., 687 F.3d 337, 348 (7th Cir. 2012). "Substantial evidence is such relevant evidence a reasonable person would deem adequate to support the ultimate conclusion." Id.  The FDIC's "inferences and conclusions drawn from the facts are entitled to deference." Id.  "We will set aside the [FDIC's] legal conclusions only if 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Id. (quoting 5 U.S.C. § 706(2)(A).)  "The arbitrary and capricious standard is a deferential one that presumes that agency actions are valid as long as the decision is supported by a rational basis." White Eagle Co-op. Ass'n v. Conner, 553 F.3d 467, 474 (7th Cir. 2009) (citations and internal quotation marks omitted).  Finally, "[u]nder both the 'arbitrary and capricious' and 'substantial

evidence' standards, the scope of review is narrow and a court must not substitute its judgment for that of the agency." Abraham Lincoln Memorial Hosp. v. Sebelius, 698 F.3d 536, 547 (7th Cir. 2012).

"As a general rule, under the APA, review of an agency's decision is confined to the administrative record to determine whether, based on the information presented to the administrative agency, the agency's decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Little Co. of Mary Hosp. v. Sebelius, 587 F.3d 849, 856 (7th Cir. 2009). A court may make an exception to permit further discovery of relevant issues, but such exceptions are rare. Id. In its opening brief, the Village asks us to defer ruling on its APA challenge until the underlying case is fully resolved. (See Village Mem. at 11.) It does not cite any case law supporting its request, nor does it develop its argument that more facts are needed to evaluate the FDIC's ruling. The FDIC opposes the Village's request, citing Sebelius, among other authorities, for the proposition that our review should be confined to the administrative record. (See FDIC Mem. at 13-14.) In its reply brief, the Village does not address these authorities or otherwise discuss its initial request to postpone ruling pending further discovery. So, consistent with the general rule in APA cases, we will confine our review to the administrative record.

**B.    The FDIC's Ruling**

Under the Federal Deposit Insurance Act, the term "deposit" includes:

> the unpaid balance of money or its equivalent received or held by a bank or savings association in the usual course of business and . . . which is evidenced by . . . a letter of credit . . . on which the bank or savings association is primarily liable: *Provided*, That, without limiting the generality of the term "money or its equivalent", any such account or instrument must be regarded as evidencing the receipt of the equivalent of money when credited or issued in exchange for . . . a promissory note upon which the person obtaining any such credit or instrument is primarily or secondarily liable . . . .

12 U.S.C. § 1813(l)(1).  In FDIC v. Philadelphia Gear Corporation, 476 U.S. 426, 440 (1986), the Supreme Court held that a standby letter of credit backed by a contingent promissory note is not a "deposit."  In this case, the FDIC concluded that the notes, which it called "reimbursement agreements," were "contingent" like the note backing the standby letter of credit in Philadelphia Gear. (See FDIC Ruling at 6.)  The FDIC also concluded that the notes had "expired" on their respective maturity dates, before the Village presented the sight drafts to Benchmark in October 2009: when the parties amended the LOC's in 2009 to extend their terms for another year, they neglected to execute new notes as they had in conjunction with previous LOC amendments. (See id. at 4.)  So, the FDIC reasoned, the case for denying the LOC's "deposit" status was even stronger than in Philadelphia Gear. (See id.)  Finally, the FDIC reasoned that other statutory provisions supported its

conclusion that the LOC's in this case are not "deposits." First, the Village did not obtain collateral from Benchmark to secure the amount of the alleged "deposits" in excess of FDIC insurance as required by Illinois law. (See id. (citing 30 ILCS 225/1, 235/6); see also id. at 6 (The Village's failure to obtain collateral "is consistent with the view that the [LOC's] were not deposits at all").) Second, the FDIC collects deposit-insurance premiums (or "assessments") from FDIC-insured banks on a semi-annual basis based upon the total amount of their "deposits." (See id. at 5.) The FDIC stated that it does not treat unfunded LOC's[4] — like the LOC's in this case — as "deposits" for the purpose of determining a bank's assessment base. (See id.) Third, the FDIC stated that tax-exempt bonds backed by unfunded LOC's would become taxable if those LOC's were deemed "deposits." (See id. at 5-6 (citing 26 U.S.C. § 149(b) (bonds are not eligible for tax exemption if they are federally guaranteed).) This could, the FDIC reasoned, negatively impact the market for municipal bonds, which are often backed by unfunded letters of credit. (See id. at 6.)

**C. Whether the FDIC's Ruling was Arbitrary and Capricious**

The FDIC reasonably concluded that the notes backing the LOC's were "contingent." In Philadelphia Gear, the parties "understood that nothing would be considered due on the note, and no interest

---

[4] In a funded LOC arrangement, the applicant advances funds to the bank sufficient to satisfy any drafts that the beneficiary may submit pursuant to the LOC. See, e.g., Matter of P.A. Bergner & Co., 140 F.3d 1111, 1115 (7th Cir. 1998).

charged by Penn Square, unless Philadelphia Gear presented drafts on the standby letter of credit after nonpayment by Orion." Philadelphia Gear, 476 U.S. at 428. Here, there is no extrinsic evidence of what the parties "understood." But the notes themselves state that any advances are conditional "PER LETTER OF CREDIT."[5] The FDIC reasonably construed this provision to mean that Hannaford's obligation to repay the notes was triggered by *actual payment* by Benchmark to the Village pursuant to the LOC's. (See FDIC Ruling at 6.) Without such a payment, nothing is "advanced" to Hannaford and there is nothing for it to repay, with interest. The Village argues that we should consider the LOC's themselves to be "advances" or "draws" on the notes. (See Village Mem. at 6; Village Reply at 6-7.) This is an awkward interpretation of the notes, which contemplate future advances of *funds* up to the "Loan Amount." But even if we found the Village's interpretation more persuasive, the FDIC's alternative interpretation would still be reasonable.

As the Village points out, Philadelphia Gear is distinguishable from our case in some respects. The plaintiff in Philadelphia Gear tendered its demand after the FDIC took over the

---

[5] The Village argues that the promissory language in the notes — "[f]or value received, I promise to pay you . . . ." — is unconditional. (See Village Mem. at 4-5.) But contracts must be construed as a whole. See Thompson v. Gordon, 948 N.E.2d 39, 47 (Ill. 2011) ("A contract must be construed as a whole, viewing each provision in light of the other provisions. The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract.") (internal citation omitted). The FDIC reasonably concluded that Hannaford's promise to pay Benchmark was conditioned on Benchmark paying the Village "PER LETTER OF CREDIT."

issuing bank.  See Philadelphia Gear, 476 U.S. at 428-29.  Here, the Village tendered drafts to Benchmark before it entered receivership.  Our case also differs from Philadelphia Gear in that the notes in this case were secured by a mortgage on the developed property, whereas the note in Philadelphia Gear was unsecured.  See Philadelphia Gear, 476 U.S. at 428.  However, despite these differences, we conclude that the FDIC reasonably interpreted Philadelphia Gear to support its decision to deny deposit insurance.  First, as we just discussed, the FDIC reasonably concluded that the notes were contingent upon payment by Benchmark, and not simply upon the Village's demand for payment.  So, the notes were still contingent obligations when the FDIC was appointed receiver, even though the Village had already presented the sight drafts for payment.[6]  Second, we do not construe Philadelphia Gear to indicate that an LOC backed by a secured note is necessarily a deposit.  The FDIC acknowledged in Philadelphia Gear that an LOC backed by a non-contingent promissory note is a deposit, as is a funded LOC.  See id. at 440; see also FDIC Interpretive Letter, dated June 4, 1990, 1990 WL 711278, *1 ("[A] standby letter of credit is most likely to be treated by the FDIC as a deposit for purposes of federal insurance when the depositor has made himself primarily liable for the letter, either by depositing funds with

---

[6] The Village does not dispute the FDIC's conclusion that the LOC's were recorded as "off-book contingent liabilities," not deposits, in the bank's records on the date of its failure.  (See FDIC Ruling at 2-3.)

the institution or by providing a non-contingent, presently effective note."). But Benchmark did not possess the mortgaged property when it went into receivership, nor did it hold any funds belonging to Hannaford or the Village. Cf. Philadelphia Gear, 476 U.S. at 435 (Congress created a system of deposit insurance in order to protect "assets and 'hard earnings' that businesses and individuals have entrusted to banks."). It merely had a security interest in the property and the right to foreclose if Hannaford failed to repay "advances" (which Hannaford never actually received).[7] Cf. id. at 440 ("[H]ere, with a standby letter of credit backed by a contingent promissory note, Penn Square was not in possession of any of Orion's or Philadelphia Gear's assets when it went into receivership. Nothing was ventured, and therefore no insurable deposit was lost."). The FDIC reasonably concluded that Benchmark did not receive "money or its equivalent" in exchange for issuing the LOC's. (See FDIC Ruling at 6.) This is sufficient, even without reaching the "expiration" question, to uphold the FDIC's ruling. However, we also conclude that the FDIC had a rational basis for concluding that the notes had expired before the Village presented its sight drafts.

---

[7] The Village emphasizes that MB Financial Bank, the entity that assumed some of Benchmark's obligations after it failed, is attempting to foreclose on the mortgage. (See Village Mem. at 4 n.2; see also id. at 6 n.3; Village Reply at 9.) The mortgage predates the earliest note by approximately six months and was originally executed to secure the initial $10 million development loan. (See Real Estate Mortgage, dated March 29, 2004, at AR 238.) So, the fact that MB Financial is foreclosing on the mortgage does not, by itself, support the Village's argument.

The parties periodically amended the LOC's to extend them for additional one-year terms, notwithstanding the LOC's "evergreen" clause. In conjunction with the LOC amendments, the parties executed new notes with "maturity dates" corresponding to the amended LOC expiration dates. If, as the Village argues (see Village Reply at 8), Hannaford was entitled to "advances" beyond the maturity date, then it would have been unnecessary to execute new notes every year. A single note would suffice to secure repayment throughout the terms of the LOC's. The Village points out that the notes impose post-maturity interest, (see Village Mem. at 5), but that is not necessarily inconsistent with the FDIC's position. If during the note's term Benchmark "advanced" funds to Hannaford, then Hannaford would owe interest at the "post maturity rate" on the unpaid balance of the note after maturity. If nothing was due on the maturity date — because nothing had been "advanced" — then the note expired, requiring the parties to execute a new note to secure future advances (if any) under the amended LOC's. On this view of the transaction, the last-executed notes expired in June and September 2009, before the Village tendered sight drafts to Benchmark. Of course, the expiration of the notes did not excuse Benchmark's performance under the LOC's. But an LOC backed by an expired contingent note is not a "deposit." We take the Village's point that if the shoe was on the other foot, and Benchmark *had* made advances to Hannaford, the FDIC would argue that

the notes are enforceable. (See Village Reply at 2-3.)  But that does not make its decision in this case irrational.

As an alternative basis for overturning the FDIC's ruling, the Village argues that the LOC's "morphed and became 'money in the bank'" seven days after it demanded payment from Benchmark. (See Village Mem. at 9-10.)  The seven-day period appears to refer to U.C.C. § 5/5-108, which gives LOC issuers up to seven business days after receiving a draft demanding payment to honor it or else give notice of "discrepancies in the presentation." 810 ILCS 5/5-108; see also BM Electronics Corporations v. LaSalle Bank, N.A., No. 04 C 5375, 2006 WL 760196, *2 (N.D. Ill. Mar. 22, 2006) ("In order to be paid under a letter of credit, the seller must make a presentation to the bank of certain documents that comply with specific terms set forth in the letter of credit.").  The issuer waives any discrepancies that it fails to raise within the seven-day period. See 810 ILCS 5/5-108(c).  The Village argues that Benchmark's failure to object to the Village's demand within seven days transformed the sight drafts into deposits, like a check deposited into a payee's account.  To support the analogy, the Village relies primarily on Hay v. The First Nat'l Bank of Springfield, Ill., 244 Ill.App. 286, 290 (Ill. App. Ct. 1927).  In Hay, Butler Oil Company ("Butler") wrote a check, drawn on its account at First National Bank, to Apex Petroleum Company ("Apex"). Id. at 287.  After Apex assigned the check to the plaintiffs to

satisfy a debt, the plaintiffs deposited the check into their own account at First National. Id. First National, in turn, credited the plaintiff's account, and debited Butler's, in the amount of the check. Id. Several days later, the bank unwound the transaction and returned the check to the plaintiffs, purportedly because there were insufficient funds in Butler's account to cover the check. Id. at 288. In fact, there were sufficient funds, but the bank had unilaterally decided that it had a superior interest to the funds based upon a debt that Butler owed the bank. Id. After returning the funds to Butler's account, the bank used them to pay itself. Id. The bank argued that its actions were authorized, citing the following condition on its deposit slip: "[a]ll items received by this bank for deposit are credited subject to final payment, reserving the right to charge back any items not paid." Id. The Hay court concluded that the check was "paid" when the bank credited the plaintiffs' account, even though the money did not actually pass through the plaintiffs' hands. Id. at 289-90. Therefore, the bank could not reverse the deposit and pay itself without the plaintiffs' consent. Id. at 290. The Village argues that Hay supports its claim because, similar to the plaintiffs in Hay, it presented sight drafts to Benchmark, which the bank did not reject. At that point, according to the Village, "the Letters of Credit ceased their life as Letters of Credit and became a deposit of money constructively held for the Village." (Village Mem. at

10.) In Hay, the plaintiffs plainly deposited the check — the question was whether the transaction was final. Here, the question is whether there has been a "deposit" at all as that term is defined in § 1813. Hay does not shed any light on that question. The Village has not cited any relevant legal authority supporting its argument that presenting a sight draft for payment pursuant to an LOC creates a "constructive deposit" entitled to FDIC insurance. The mere fact that Benchmark was obligated to pay the Village does not make the Village a depositor, unless all of the bank's creditors are depositors.

Finally, the Village does not respond at all to the FDIC's conclusions about the broader implications of treating these types of LOC's as deposits. (See FDIC Ruling at 5-6; see also FDIC Mem. at 13.) We believe that the FDIC should have supported its reasoning with more current examples of its own operating procedures.[8] But its analysis is unchallenged. Conversely, the Village does not cite any broader public policy interests beyond its own interest in obtaining deposit insurance in this case.

---

[8] The FDIC relied chiefly on Philadelphia Gear, which the Supreme Court decided nearly thirty years ago, and amicus briefs filed in that case, to support its assertions about deposit-insurance premiums and the possible tax implications for municipal bonds if unfunded LOC's are treated as deposits. (See FDIC Ruling at 5-6.)

## **CONCLUSION**

We conclude that the FDIC had a rational basis for its ruling denying the Village's claim for deposit insurance.  Accordingly, we uphold its ruling under the APA.  A status hearing is set for July 10, 2013 at 10:30 a.m.


DATE:       June 27, 2013

ENTER:      _____
            John F. Grady, United States District Judge